Mur Lee GRANT, Appellant,

v.

SOUTHWESTERN ELECTRIC POWER COMPANY, Appellee.

No. 06–98–00159–CV.

Court of Appeals of Texas, Texarkana.

Aug. 6, 1999.

Submitted July 1, 1999.

Decided Aug. 6, 1999.

Joseph L. Rosenfield, Dallas, for appellant.

Stayton L. Worthington, Brown McCarroll & Oaks Hartline, Longview, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## O P I N I O N

Opinion by Justice GRANT.

This is an appeal from a summary judgment granted in favor of Southwestern Electric Power Company (SWEPCO) in a negligence suit brought by Mur Lee Grant for personal injuries and property damage. In three points of error, Grant contends (1) the trial court erred in finding no evidence of negligence, (2) the trial court erred in failing to allow Grant to proceed to trial based upon a genuine issue of material fact and allegations of gross negligence, and (3) the trial court erred in granting a summary judgment in favor of SWEPCO based upon the law.

On or about June 10, 1995, Grant experienced electrical problems at her home. She noticed that her lights were going from bright to dim. Grant's husband, Harolie, testified during his deposition that a thunderstorm came and "the house just lit up and all the lights outside—the yard lights lit up." He turned off the breakers to their house, but he testified that the lights were "still lit up all over the house, the outside, too, with the breakers off." However, in his affidavit, he stated that "[a]t the time we first experienced the problems there was no severe weather in the area. In fact, it did not begin to rain until shortly after the electrician came to our [house] late in the evening. It continued to rain throughout the remainder of the night."

Grant began to smell smoke and noticed that smoke was coming from a VCR and a television. She noticed that they were not working properly, so she unplugged them. Grant testified during her deposition:

"It would—now, when—on the—in between the time that he [the troubleman] was there the first time, the lights would brighten up real white. They [the lights] would go dim. They never went totally out, but they would dim. Now, my refrigerator and stuff like that, they quit working. They just quit working. And the—all the things then quit working, like microwaves, TVs, and stuff like that. That's when we found out they were—they were all burned out. . . ."

She called SWEPCO, and SWEPCO sent a troubleman to her residence around 11:00 p.m. The troubleman, Henri Killgore, checked the voltage of the electricity coming into the home from the meter outside the house, using standard procedures. The voltage checked out O.K., and Killgore told Grant to contact an electrician. The electrician arrived at Grant's house later that evening. Bill Turner, the electrician, testified in his deposition that Grant told him the SWEPCO troubleman had said that the problem was not caused by any electrical problem outside of her home and that it must have been caused by an electrical problem inside her home. Turner checked the electrical box inside her home and determined that the voltage readings

were not consistent. He explained that the inconsistent voltage readings were causing her lights to go from bright to dim.

Upon Turner's advice, Grant called SWEPCO again, and Killgore returned to the Grant house at approximately 12:30 a.m. Turner waited for Killgore and told Killgore what he had done. The first thing Killgore did was to pull the meter (as he had done on his first visit) and check the flow of electricity to the Grant home. Killgore found a floating or irregular voltage problem. Killgore checked the power lines and discovered that a tree limb had fallen on a secondary neutral line, damaging it. Killgore proceeded to repair the fallen line and completed all of the necessary repairs within four hours of his initial visit to the Grant home. In his deposition testimony, Grant's husband testified that they experienced no further problems.

The following Monday, Grant took a list of her damaged appliances to a SWEPCO representative and told her what had happened. Jackie Gassoway, who worked in customer service, told Grant that an adjuster would come to her house later that afternoon. According to Grant's deposition testimony, she got a call from SWEPCO around 5:00 p.m., explaining that they would not be coming to get the damaged appliances and that she needed to take them to get them repaired. She told the SWEPCO representative she did not want to touch them because she was afraid of them.

After the phone call, she disconnected the appliances that were not already disconnected. She put a microwave, a small television, and a toaster on the kitchen table. According to her deposition testimony, as she was walking by the kitchen table, she smelled something burning. She turned around, and when she did, she saw a streak of light. The streak of light hit her in the face and went up her nose, knocking her against the door facing and nearby clothes dryer. She did not know if the streak of light came either from the appliances, a nearby plug, or a nearby light switch. According to her affidavit, the surge of electricity came from one of the appliances she was attempting to disconnect or from an electrical outlet. However, Mr. Grant testified that his wife said a surge "came out of that TV and went up her nostrils." In her affidavit, Grant contends she suffered a severe electrical shock, causing her injuries and further damage to her property. In her first amended petition, Grant alleges she suffered physical pain, mental anguish, $7,400 in medical expenses, loss of earnings, and damages to her property.

■ Grant contends the trial court erred in finding no evidence of negligence. The trial court granted summary judgment in favor of SWEPCO based upon the law and no evidence. SWEPCO moved for summary judgment on two theories: (1) that there was no evidence of negligence,[1] gross negligence, or willful misconduct, and (2) that SWEPCO was not liable under its tariff on file with the Public Utility Commission (PUC), regardless of any alleged negligence, for voltage fluctuations due to an accident, a breakdown of power lines, or an act of God. SWEPCO's motion contained both a no-evidence summary judgment motion under Rule 166a(i) and an ordinary summary judgment motion,

---

1. SWEPCO's motion met the requirements of a no-evidence summary judgment motion by stating the element on which there was no evidence. The comment to Rule 166a(i) states that the rule does not authorize conclusory motions or general no-evidence challenges to an opponent's case. Although SWEPCO's motion argued there was no evidence of negligence, the context of the motion shows there was no evidence it owed Grant a duty. SWEPCO was not arguing there was no evidence of a cause of action for negligence, i.e., duty, breach, proximate cause, and damages. Such a general contention would fail to meet the requirement that the motion must state the specific element(s) for which there was no evidence.

under Rules 166a(b) & (c).[2] The rules do not prohibit such a hybrid motion, but we think the better practice is either to file two separate motions, one containing the no evidence summary judgment and one containing the ordinary summary judgment, or to file one document containing both motions but with the arguments and authorities for each clearly delineated and separate from one another.

First, we will address SWEPCO's contentions that there was no evidence that it owed a duty to Grant or that it acted in an unreasonable or imprudent manner.

On September 1, 1997, the Texas Supreme Court adopted Rule 166a(i):

> After adequate time for discovery, a party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. The motion must state the elements as to which there is no evidence. The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact.[3]

Where a motion is presented under Rule 166a(i) asserting there is no evidence of one or more essential elements of the non-movant's claims upon which the nonmovant would have the burden of proof at trial, the movant does not bear the burden of establishing each element of its own claim or defense under subparagraphs (a) or (b) of Rule 166a. Rather, although the nonmoving party is not required to marshal its proof, it must present evidence that raises a genuine fact issue on the challenged elements.[4] A no-evidence summary judgment is essentially a pretrial directed verdict; therefore, we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict.[5] We must determine whether the nonmovant produced any evidence of probative force to raise a fact issue on the material questions presented.[6] We consider all the evidence in the light most favorable to the party against whom the no-evidence summary judgment was rendered, disregarding all contrary evidence and inferences.[7] A no-evidence summary judgment is improperly granted if the nonmovant presents more than a scintilla of probative evidence to raise a genuine issue of material fact.[8] More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions."[9]

Neither party contends there was not enough time for adequate discovery. Thus, we will not address this aspect of the new rule. Grant contends she raised a fact issue on whether SWEPCO owed her a duty because the summary judgment proof raises fact issues: (1) on the reasonableness of the tariff by proof that her damages were large compared to her inability to collect damages under the tariff, (2) on whether SWEPCO could have solved the problem if its technician had discovered the problem with its electrical lines and shut off the electrical current to Grant's house, (3) on whether SWEPCO acted negligently in failing to discover the problem on its initial visit, and (4) on whether SWEPCO failed to take appropriate action in accordance with their agree-

---

**2.** Tex.R. Civ. P. 166a(b), (c) & (i).

**3.** Tex.R. Civ. P. 166a(i).

**4.** *See* Tex.R. Civ. P. 166a, Notes and Comments.

**5.** *Jackson v. Fiesta Mart, Inc.,* 979 S.W.2d 68, 70 (Tex.App.-Austin 1998, no pet. h.).

**6.** *Id.*

**7.** *Merrell Dow Pharmaceuticals v. Havner,* 953 S.W.2d 706, 711 (Tex.1997), *cert. denied* —— U.S. ——, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998).

**8.** *Fiesta Mart, Inc.,* 979 S.W.2d at 70–71.

**9.** *Havner,* 953 S.W.2d at 711.

ment to remove and repair the damaged appliances. Grant's first three arguments will be considered in light of the tariff.

 Negligence requires proof of four well-known elements: (1) the existence of a duty; (2) the breach of that duty; (3) that the breach was a proximate cause of damages; and (4) that the plaintiff was damaged.[10] Duty is the threshold inquiry; a plaintiff must prove the existence and violation of a duty owed to him by the defendant to establish liability in tort.[11] Moreover, the existence of a duty is ultimately a question of law for the court to decide from the facts surrounding the occurrence in question.[12]

 SWEPCO is an electric utility in the State of Texas as that term is defined in the Texas Utility Code § 31.002(1).[13] Under the Public Utilities Regulatory Act (PURA), the Legislature has conferred jurisdiction upon the PUC to regulate utility rates, operations, and ser-vices.[14] The PURA requires each utility to file a tariff with the PUC.[15] A tariff is a document which lists a public utility's services and the rates for those services.[16] Unless found to be unreasonable, filed tariffs govern a utility's relationship with its customers and have the force and effect of law.[17] Tariffs, thus, amount to a binding contract between the utility and its customers.[18] Because a tariff is presumed reasonable, the burden to prove unreasonableness is on the customer.[19]

 First, we will examine whether Grant raised a fact issue on the reasonableness of the tariff by proof that her damages were large compared to her inability to collect damages under the tariff. Grant contends that whether a tariff is reasonable is a question of fact for a jury. She directs our attention to four cases, *Calarco v. Southwestern Bell Telephone Company*,[20] *Southwestern Bell Telephone Company v. Reeves*,[21] *Auchan USA, Inc. v.*

10. *Judwin Properties, Inc. v. Griggs & Harrison, P.C.*, 981 S.W.2d 868, 869 (Tex.App.-Houston [1st Dist.] 1998, no pet.) (citing *Cosgrove v. Grimes*, 774 S.W.2d 662, 665 (Tex. 1989)).

11. *Abalos v. Oil Dev. Co.*, 544 S.W.2d 627, 631 (Tex.1976).

12. *Sosa v. Williams*, 936 S.W.2d 708, 710 (Tex.App.-Waco 1996, writ denied) (citing *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990)).

13. Tex. Util.Code Ann. § 31.002(1) (Vernon 1998).

14. *See* Tex. Util.Code Ann. § 14.001 (Vernon 1998).

15. Tex. Util.Code Ann. § 32.101 (Vernon 1998).

16. *Henderson v. Central Power & Light Co.*, 977 S.W.2d 439, 446 (Tex.App.-Corpus Christi 1998, pet. denied) (citing *Southwestern Bell Tel. Co. v. Metro–Link Telecom, Inc.*, 919 S.W.2d 687, 691 (Tex.App.-Houston [14th Dist.] 1996, writ denied)).

17. *Central Power & Light Co.*, 977 S.W.2d at 446–47 (citing *Auchan USA, Inc. v. Houston Lighting & Power Co.*, 961 S.W.2d 197, 201

(Tex.App.-Houston [1st Dist.] 1996), *rev'd*, 995 S.W.2d 668 (Tex.1999)); *see Metro–Link Telecom, Inc.*, 919 S.W.2d at 692; *Southwestern Bell Tel. Co. v. Vollmer*, 805 S.W.2d 825, 829 (Tex.App.-Corpus Christi 1991, writ denied), *overruled by Houston Lighting and Power Co. v. Auchan USA, Inc.*, 995 S.W.2d 668 (Tex. 1999).

18. *Central Power & Light Co.*, 977 S.W.2d at 447 (citing *Auchan USA, Inc.*, 961 S.W.2d at 200; *Roberts Express, Inc. v. Expert Transp., Inc.*, 842 S.W.2d 766, 771 (Tex.App.-Dallas 1992, no writ); *Common Carrier Motor Freight Ass'n, Inc. v. NCH Corp.*, 788 S.W.2d 207, 209 (Tex.App.-Austin 1990, writ denied); *see also Vollmer*, 805 S.W.2d at 830 (tariff also represents the utility's "contract with the State")).

19. *Vollmer*, 805 S.W.2d at 829.

20. 725 S.W.2d 304 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.), *overruled by Houston Lighting and Power Co. v. Auchan USA, Inc.*, 995 S.W.2d 668 (Tex.1999).

21. 578 S.W.2d 795 (Tex.Civ.App.-Houston [1st Dist.] 1979, writ ref'd n.r.e.), *overruled by Houston Lighting and Power Co. v. Auchan USA, Inc.*, 995 S.W.2d 668 (Tex.1999).

*Houston Lighting & Power Company*,[22] and *Southwestern Bell Telephone Company v. Vollmer*,[23] in support of this contention. All four of the cases hold that the reasonableness of a tariff is a fact issue for a jury.

The plaintiff company in *Auchan USA, Inc.* made the same argument Grant makes, that its damages were large compared to the recovery allowed by the tariff. The Houston Court of Appeals found the summary judgment proof raised a fact issue on whether the tariff was reasonable when the plaintiff's damages substantially exceeded the compensation available under the tariff and when Houston Power and Light unreasonably delayed repairing the outage.[24] On appeal, the Texas Supreme Court stated that it was unaware of any other jurisdiction that had adopted a rationale similar to that of *Reeves* or *Calarco* in determining the reasonableness of a tariff.[25] The Court disapproved of the analysis applied in *Reeves*, *Calarco*, *Vollmer*, and the lower court's decision in *Auchan USA, Inc.*[26] Following the Supreme Court's reasoning in *Auchan USA, Inc.*, we find that the reasonableness of the tariff in the instant case was not a fact issue for the jury.[27]

 Further, Grant has not rebutted the presumption that the tariff in the instant case was reasonable. During oral argument, Grant's attorney argued that Grant had rebutted the presumption that the tariff was reasonable because the tariff limits SWEPCO's liability for all negligence on its part. Paragraph one of the tariff states that it applies to electrical service provided by SWEPCO. Paragraph eight, which limits SWEPCO's liability for fluctuations in voltage caused by acts beyond its control and for negligence on its

part in this regard, is entitled Continuous Service. The tariff does not limit SWEPCO's liability for all negligence or damages; it only limits SWEPCO's liability for damages caused by interruptions in service. Further, the tariff does not limit SWEPCO's liability for gross negligence or willful misconduct. A thorough reading of the tariff as a whole does not support Grant's argument that the tariff limited SWEPCO's liability for all negligence on its part. The tariff on file here provides:

## 1. APPLICABLE TO ALL CLASSES OF ELECTRIC SERVICE

In order that all Customers may receive uniform, efficient, and adequate service, electric service will be supplied to and accepted by all Customers receiving service from the Company in accordance with these Terms and Conditions.

. . . .

## 8. CUSTOMER'S INSTALLATION

**Customer is responsible for installing and maintaining such protective devices as are recommended or required by the then current edition of the National Electrical Code or as may be necessary to protect Customer's equipment or process during abnormal service conditions or the failure of all or a part of the electric service provided by the Company.** All wiring and other electrical equipment furnished by the Customer will be installed, operated, and maintained by the Customer at all times in conformity with good electrical practice and with the requirements of the constituted authorities and these Terms and Conditions.

. . . .

22. 961 S.W.2d 197.

23. 805 S.W.2d 825.

24. *Auchan USA, Inc.*, 961 S.W.2d at 203.

25. *Houston Lighting and Power Co. v. Auchan USA, Inc.*, at 670–71. At the time of this

writing, the Supreme Court's decision is final. No motions for rehearing were filed by either side as of July 29, 1999.

26. *Id.* at 670–71. .

27. *Id.* at 675.

### 13. CONTINUOUS SERVICE

Company will make reasonable provisions to insure satisfactory and continuous service, but **does not guarantee a continuous supply of electric energy or that the voltage, wave form or frequency of the supply will not fluctuate.** The Company **shall not be liable for damages occasioned by interruption, failure to commence delivery, or voltage, wave form or frequency fluctuation caused by interruption or failure of service or delay in commencing service due to accident to or breakdown of plant, lines, or equipment, strike, riot, act of God**, order of any court or judge granted in any bonafide adverse legal proceedings or action or any order of any commission or tribunal having jurisdiction; or, **without limitation by the preceding enumeration, any other act or things due to causes beyond its control, to the negligence of the Company, its employees, or contractors, except to the extent that the damages are occasioned by the gross negligence or willful misconduct of the Company.**

(Emphasis added.)

██ In evaluating Grant's argument that the tariff was unreasonable, we will look to the CP & L decision [28] which has received considerable attention from the public utility industry because it was the PUC's bellwether decision as to whether it would authorize tariff provisions that limited liability for damages. The tariff on file in the instant case limited SWEPCO's damages for service interruptions caused by irregular voltage due to acts of God or accident. Force Majeure clauses or clauses limiting liability for acts beyond a utility company's control [29] are eminently reasonable. [30] In the CP & L decision, the PUC determined that rates charged to customers could be affected by ·increasing the utilities' exposure to claims of liability. [31] A number of state courts have also concluded that, absent a limitation of liability for ordinary negligence, utilities would be forced to raise rates charged to their customers. [32]

The tariff here also placed the burden of protecting appliances from damages due to abnormal service conditions on the customer. The PUC concluded in the CP & L decision that the burden of estimating potential damages and of obtaining protection against losses caused by electrical outages should fall on the customer, not the utility. [33] The PUC reasoned that an electric utility is unable to anticipate the "nature and size of the claims that can be

28. See *Application of Central Power & Light Company for Approval of Tariff Amendment*, No. 3198, 1981 Tex. PUC LEXIS 247, at *10, 7 Texas P.U.C. Bulletin 53, 1981 WL 178870 (June 22, 1981) (CP & L Decision).

29. See BLACK'S LAW DICTIONARY 445 (6th ed.1991).

30. See CP & L Decision, *supra* at *15.

31. CP & L Decision, *supra* at *58.

32. See *Cole v. Pac. Tel. & Tel. Co.*, 112 Cal. App.2d 416, 246 P.2d 686, 688 (1952); *Landrum v. Florida Power & Light Co.*, 505 So.2d 552, 554 (Fla.Dist.Ct.App.1987); *Southern Bell Tel. & Tel. Co. v. Invenchek, Inc.*, 130 Ga.App. 798, 204 S.E.2d 457, 460 (1974); *In re Illinois Bell Switching Station Litig.*, 161 Ill.2d 233, 204 Ill.Dec. 216, 641 N.E.2d 440, 446 (1994); *Singer Co. v. Baltimore Gas &*

*Elec. Co.*, 79 Md.App. 461, 558 A.2d 419, 427 (1989); *Wilkinson v. New England Tel. & Tel. Co.*, 327 Mass. 132, 97 N.E.2d 413, 416 (1951); *Computer Tool & Eng'g, Inc. v. Northern States Power Co.*, 453 N.W.2d 569, 573 (Minn.Ct.App.1990); *Montana ex rel. Mountain States Tel. & Tel. Co. v. District Court*, 160 Mont. 443, 503 P.2d 526, 528–29 (1972); *Bulbman, Inc. v. Nevada Bell*, 108 Nev. 105, 825 P.2d 588, 590–91 (1992); *Coachlight Las Cruces, Ltd. v. Mountain Bell Tel. Co.*, 99 N.M. 796, 664 P.2d 994, 998–99 (1983); *Lee v. Consol. Edison Co.*, 98 Misc.2d 304, 413 N.Y.S.2d 826, 828 (N.Y.App.Term.1978); *Behrend v. Bell Tel. Co.*, 242 Pa.Super. 47, 363 A.2d 1152, 1165 (1976), *vacated and remanded*, 473 Pa. 320, 374 A.2d 536 (Pa.1977), *aff'd on remand*, 257 Pa.Super. 35, 390 A.2d 233 (1978); *Allen v. Gen. Tel. Co.*, 20 Wash.App. 144, 578 P.2d 1333, 1337 (1978).

33. See CP & L Decision, *supra* at *16.

incurred because of service interruptions" and that it is not feasible to require a utility "to protect itself against these potential losses, which simply cannot be accurately ascertained." [34]

Here, Grant testified that her appliances were not working properly and had burned out on the night the troubleman came to her house. There is no dispute that a tree limb fell on the power line, damaging it. Whether the falling tree limb was due to an act of God (such as a thunderstorm) or an accident is immaterial because the tariff limited SWEPCO's liability for acts beyond its control. In light of the court's rationale in the CP & L decision, the clause here was reasonable. Further, in light of the Supreme Court's decision in *Auchan USA, Inc.*, Grant's argument that a fact question was raised on the reasonableness of the tariff by proof that her damages were large when compared to the amount of recovery allowed under the tariff is unpersuasive. Because the tariff limited SWEPCO's liability for damages as a result of fluctuations in electricity, SWEPCO had no duty to protect Grant from damages as a result of the damaged power line. Therefore, Grant did not raise a fact issue on SWEPCO's negligent violation of a duty owed to her. We need not address whether SWEPCO acted in a reasonable and prudent manner in light of our analysis of duty above.

■ Grant next contends the evidence raises a fact issue because SWEPCO acted negligently in failing to discover the problem on its initial visit, and SWEPCO could have prevented Grant's damages if its technician had discovered the problem with its electrical lines and shut off the electrical current to Grant's house. The electrician testified that the problem was the irregular flow of voltage onto the property caused by the damaged secondary neutral line. The SWEPCO troubleman stated in his affidavit that on the first visit to the Grant home, he checked the voltage using standard procedures and the voltage

checked out O.K. Grant's husband testified during his deposition that the troubleman stayed a long time and told them to call an electrician. The only summary judgment proof that could raise a genuine issue of material fact in the absence of the tariff is the electrician's testimony that "[t]he service technician [the SWEPCO troubleman] did not discover the problem on his initial visit to the home of Ms. Grant. . . . Had the problem been discovered by the technician on the initial visit, the electricity could have been disconnected until the problem was found and repaired." This testimony, however, does not raise a genuine issue of material fact because the tariff precludes SWEPCO's liability for damages due to voltage fluctuations and precludes SWEPCO's liability for the negligence of its employees when there is a failure of continuous service. The tariff also precludes SWEPCO's liability for damages to Grant's appliances from the voltage fluctuations. For this reason, neither of Grant's arguments is persuasive.

■ Next, we will examine whether Grant presented any summary judgment proof raising a fact issue on whether SWEPCO acted negligently, causing her personal injuries. Grant's alleged personal injuries occurred on the Monday following the troubleman's visit to her house. She contends that while disconnecting appliances, a "streak of light" hit her in the face, shocking her. Grant presented no summary judgment proof showing that the cause of the streak of light was something other than irregular voltage. Assuming the streak of light was caused by something other than irregular voltage, Grant did not present summary judgment proof that streaks of light were events SWEPCO could foresee or that SWEPCO had a duty to protect its customers from such streaks of light. Again, the tariff precludes SWEPCO's liability for fluctuations in voltage and the damages caused by fluctuations in voltage. Further, the tariff placed

---

34. CP & L Decision, *supra* at *58.

the burden upon the customers to install devices in their homes to protect against power surges. Grant has failed to raise a genuine issue of material fact that SWEPCO was negligent in failing to prevent her personal injuries in the face of SWEPCO's no-evidence summary judgment motion.

■ Next, we will address Grant's argument that a fact issue exists as to whether SWEPCO failed to take appropriate action in accordance with its agreement to remove and repair the damaged appliances. The gist of Grant's argument is that when SWEPCO agreed to remove the appliances and repair them, it created a duty on SWEPCO's part to remove them, and that SWEPCO breached this duty by telling Grant to take them to be repaired. Grant also is arguing that her injuries resulted from SWEPCO's failure to remove the appliances. Grant stated in her affidavit that "[h]ad I not been advised by the representative of Southwest Power Electric Company [sic] to disconnect the appliances myself, I would not have suffered the injuries or further damage to my property." Grant does not cite us to any law in support of this contention. However, Section 323 of the Restatement (Second) of Torts applies to the present situation. Section 323 is entitled "Negligent Performance Of Undertaking to Render Services," and it states

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.[35]

Comment a to Section 323 states that the section applies to any undertaking to render services to another which the defendant should recognize as necessary for the protection of the other's person or things.[36] Grant did not present any summary judgment proof raising a fact issue that SWEPCO should have recognized that its action was necessary for the protection of Grant or her things. As discussed above, Grant's appliances were already damaged; therefore, they were not damaged as a result of SWEPCO's failure to pick them up on Monday. Grant presented no summary judgment proof that SWEPCO could have foreseen her injuries as a result of its failure to remove the appliances. In *Seay v. Travelers Indemnity Company*,[37] the court examined the holding in *Fox v. Dallas Hotel Company*.[38] The Dallas Court of Appeals stated that the Court's discussion in *Dallas Hotel Company* made it clear that the basis of liability accrues when the tort-feasor undertakes to perform services for another which are attended by grave risks.[39] Grant presented no summary judgment proof showing that SWEPCO's failure to remove her appliances would involve grave risk to her or that SWEPCO realized there was any risk to Grant if it did not remove the appliances. Accordingly, Grant has failed to raise a fact issue on whether SWEPCO failed to take appropri-

**35.** RESTATEMENT (SECOND) OF TORTS § 323 (1965); *see also Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 395–96 (Tex.1991). One who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other's person or property will not be injured thereby. *Fort Bend County Drainage Dist.*, 818 S.W.2d at 395–96.

**36.** RESTATEMENT (SECOND) OF TORTS § 323, cmt. a (1965).

**37.** 730 S.W.2d 774 (Tex.App.-Dallas 1987, no writ).

**38.** 111 Tex. 461, 240 S.W. 517, 520 (1922), *overruled on other grounds, Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 925 (Tex.1981).

**39.** *Travelers Indem. Co.*, 730 S.W.2d at 776.

ate action in accordance with its agreement to remove and repair the damaged appliances. This point of error is overruled.

Next, Grant contends the trial court erred in failing to allow Grant to proceed to trial based upon a genuine issue of material fact and allegations of gross negligence by Grant. The tariff does not preclude SWEPCO's liability for damages as a result of gross negligence or willful misconduct of the company. Although this is a summary judgment case, it is important for our discussion to explain that in order to recover exemplary damages, a plaintiff must prove by clear and convincing evidence that the defendant acted with malice.[40] The Texas Civil Practice and Remedies Code defines malice as follows

"Malice" means

(A) a specific intent by the defendant to cause substantial injury to the claimant; or

(B) an act or omission:

(i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.[41]

Grant contends that the summary judgment proof raises a fact issue on whether SWEPCO was grossly negligent (1) when its troubleman failed to detect the electrical problem on his first visit to her house, (2) when its troubleman failed to check her appliances after she smelled smoke and saw smoke coming from her appliances, and (3) when its customer service representative failed to have the appliances removed from her home and repaired.

SWEPCO contends Grant did not plead gross negligence and therefore has waived this point of error. The only language in Grant's first amended petition that comes close to an allegation of gross negligence is in paragraph three where Grant alleges that SWEPCO was negligent in "its total disregard for the safety of Plaintiff's person or property." After a thorough review of Grant's first amended petition, in no place did she use the words "gross negligence," did she allege SWEPCO acted with malice, or did she allege SWEPCO had an actual awareness of an extreme degree of risk created by its conduct. Courts have continuously held that in the absence of any special exceptions, a petition shall be construed liberally in favor of the pleader.[42] Additionally, the Texas Rules of Civil Procedure state that all pleadings shall be construed so as to do substantial justice.[43] The rules of pleading in this state do not require any particular form. The petition shall contain a short statement of the cause of action sufficient to give fair notice of the claim involved.[44] In the interests of justice, we will address Grant's gross negligence contention, but we note that had Grant's first amended petition contained an allegation using the definition of malice or containing the words "gross negligence," SWEPCO would not now be contending that Grant did not plead gross negligence.

---

40. Tex. Civ. Prac. & Rem.Code Ann. § 41.003(b) (Vernon 1997).

41. Tex. Civ. Prac. & Rem.Code Ann. § 41.001 (Vernon 1997).

42. Cox v. Union Oil Co. of California, 917 S.W.2d 524, 525–26 (Tex.App.-Beaumont 1996, no writ) (citing Boyles v. Kerr, 855 S.W.2d 593, 601 (Tex.1993); Roark v. Allen,

633 S.W.2d 804, 809 (Tex.1982); Sample v. Freeman, 873 S.W.2d 470, 474 (Tex.App.-Beaumont 1994, writ denied); Cartwright v. MBank Corpus Christi, N.A., 865 S.W.2d 546, 551 (Tex.App.-Corpus Christi 1993, writ denied)).

43. See Tex.R. Civ. P. 45.

44. See Tex R. Civ. P. 79.

First, we will address Grant's argument that the summary judgment proof raises a fact issue on whether SWEPCO was grossly negligent when its troubleman failed to detect the electrical problem on his first visit to her house. As discussed earlier, the troubleman came to the Grant house and stayed a long time. He did not find a voltage problem while using standard procedures on his first visit, and he told Grant she needed to call an electrician. Nothing in this summary judgment proof shows he was aware of any risk to Grant or her property, because he found no problem with the voltage going to the Grant home. Nor does the summary judgment proof show that he was consciously indifferent to her safety in the face of any risk. This argument is unpersuasive.

Next, we will address Grant's argument that SWEPCO was grossly negligent when its troubleman failed to check her appliances after she smelled smoke and saw smoke coming from her appliances. Nothing in the summary judgment proof affirmatively shows that Grant told the troubleman that she smelled smoke or that she saw smoke coming from her appliances. The troubleman stated that he normally has conversations with customers in these types of situations, but the summary judgment proof does not reflect the substance of their conversation.

The troubleman testified that he can turn off the electrical service if there is a safety problem. However, Grant presented no summary judgment proof raising a fact issue on gross negligence because she made no showing that the troubleman was aware of or was consciously indifferent to any safety problem during his first visit, when he found no voltage problems. Nor is there summary judgment proof showing he was aware of a safety problem on his second visit, because he repaired the secondary neutral line. This argument is also unpersuasive.

Last, we will address Grant's argument that the summary judgment proof raised a fact issue on gross negligence when its customer service representative failed to have the appliances removed from her home and repaired. Nothing in the record shows that SWEPCO was aware of any risk to Grant from its failure to remove the appliances or that SWEPCO was consciously indifferent to Grant's safety when it was aware of a safety problem. Therefore, Grant has failed to raise a fact issue in this regard. This point of error is overruled.

Because Grant failed to present any summary judgment evidence raising a fact issue in the face of SWEPCO's no-evidence summary judgment motion, we need not address Grant's last point of error.

The judgment is affirmed.